The first case of oral argument is Telescope Media Group v. Kevin Lindsey The District Court repeatedly referred to this as videography or videographer services. So you dispute that that is what is going to be provided here? Well, they are videography and filmmaking services, but this is compelled speech. The process of creating speech is protected to the same extent as the final product. The final product here is a film, a compelling film, wedding cinema. And that's protected by the First Amendment. And the process of creating that is protected to the same extent as the final product. If that weren't the case, then the state could regulate the writing of books, the printing of newspapers. They could commandeer the artist's hand and force him to paint something he doesn't want to paint, so long as they protected just the final product. How do we address the fact, I guess, that this is a wedding and that the Supreme Court has said that same-sex couples have the liberty right to marry? And so isn't this a little bit different than just forcing the hand of a painter's wife to brush such that it's something that's so connected to sexual orientation, this right to marry, that it sets it aside, that then the state's interest is that much higher? Well, I think masterpiece is important here, Your Honor, because in masterpiece, the Court clearly understood that there would be instances where these laws went too far and forced people to express messages endorsing an idea of marriage they disagreed with. The Court in masterpiece said that what's needed in this context is more tolerance and respect. So what do you think masterpiece tells us? It's not a cake, right? We've got something that's perhaps arguably more expressive, at a minimum more expressive than just the cake itself. We can get into the drawing on the cake. But do we have any message from the Supreme Court that is unified from those fractured opinions that really gives us an answer, or is it truly guidance? And if it is guidance, what is it? Well, the guidance from the majority opinion is certainly that there will be times when these laws go too far and could require people to engage in expression they disagree with. And the Court's message is that tolerance and respect is needed in this context. And the state doesn't tolerate and respect the beliefs that people like Carl and Angel hold when they threaten them with fines and jail time to force them to express an idea about marriage that they disagree with. And so I think the difference between here and masterpiece is, in masterpiece, it wasn't clear whether the cake artist was protected by the free speech doctrine. But this case squarely presents the question that the Supreme Court reserved. The Supreme Court was obviously acknowledging that free speech rights and expressive rights could be implicated. The Court even said that the beliefs that Carl and Angel Larson hold are protected views and sometimes protected expression, and that they have to be able to live by those beliefs in the public square. You can't live by those beliefs in the public square if the government has the power to force you under the threat of fines and jail time to create a message endorsing a view of marriage you disagree with. It would be no different than the government saying that an atheist marketer could be forced and threatened under the threat of fines and jail time to create a billboard campaign for a church promoting belief in God. And that's what the state's theory requires. I think it's important to understand that the state's theory is, as soon as a speaker enters the marketplace, their First Amendment rights are canceled. And not only that, the state does not accept any distinction between message and person. Even the district court understood that the state had gone way too far in its theory, saying that an author who objected to writing a book promoting same-sex marriage, because he objected to same-sex marriage, could do so, because that would be an objection to the message and not the person. You really stress the message and person distinction in your brief, and I want to press you a little bit on that, which is to say that your argument is, look, we will serve anyone who comes in the door. We just won't do same-sex wedding videos. And I wonder if the distinction is as clean as you propose, which is to say that essentially what you're doing is you're saying we have this menu of services that we provide, and we'll serve you. We'll do a birthday video. We'll do all of these other things. But on this menu of services, the one thing on that menu that we won't do is same-sex wedding videos. We just won't do them. And so if you're a person coming in who wants that particular service, you just simply can't get it. So I wonder if that distinction between person and message is as clean as you suggest it is. Well, Your Honor, I think it is clean in this case, first of all, because of the inherently expressive nature of a wedding. Weddings send messages about the marriages that are the subject of that wedding day. And that's the message that the Larsons object to. They object to sending that inherently religious, expressive message about marriage. They don't want to promote conceptions of marriage through their films. And that's what they're objecting to. But, Your Honor, in addition to that, Hurley involved a situation where there was clear overlap between the protected characteristic and the message. And the court said the free speech doctrine and the compelled speech doctrine required that the speaker be protected. In that case, the lesbian and gay contingent wanted to march behind a sign that celebrated their sexual orientation. So there was a direct connection to the protected characteristic. And the court still said it was proper under those circumstances to determine whether it was an objection to the message or to the person. And I think that's what's critical under these circumstances is that the Supreme Court has already balanced public accommodation laws that include sexual orientation and First Amendment rights when they come into conflict. Here, just like in Hurley, speech itself is being treated as the public accommodation. There it was the parade. Here it is the creation of films, expressing messages through films that you disagree with. In addition to that, Your Honor, the message-person distinction applies in this case. And the larsens clearly are objecting to the message that's expressed in a wedding ceremony that they disagree with. Your Honor, the- Let me ask you this question. Is a same-sex wedding, is that the only kind of wedding that the appellants would not portray for religious- The complaint says that the appellants desire to convey religiously-motivated messages about marriage. And so the question is, are there other kinds of marriages or wedding situations or scenarios that they would also refuse to portray or incorporate into the video composition? Sure, Your Honor. They wouldn't do anything celebrating a polygamous marriage. They also are very selective about the marriages that they will, the stories they will tell through marriage, and they want to reinforce their religious beliefs. So they want to find weddings and couples, like the wedding video that was submitted in the record at the Joint Appendix at 115. If you watch that video, you see that that video extols the role of God in that marriage and talks about God's design for marriage and how it's a celebration of the man and the woman and how it reflects God's relationship with his people. These are the kind of messages that the Larsons want to reinforce through their films. So they're going to be highly selective regarding the types of wedding ceremonies and marriage relationships that they'll promote through their films. Is that clear in the text of the complaint? Since this is at the motion to dismiss stage, do you think that's adequately alleged? Yes, Your Honor, I do. I think the complaint makes it clear that the Larsons want to promote a view of marriage that reflects the lifelong commitment between one man and one woman that is God-ordained and has spiritual implications. And those allegations are in the complaint. Your Honor, in addition, there is, and I would add to that, Your Honor, that the district court did find that there are no factual disputes at all, that the case presents an issue purely of a purely legal question for the court to determine. And I think that's correct. It seems to me that when the way you describe or the way it's been described, the type of videos that the Larsons want to produce are some kind of a hybrid between a movie, you started your argument referencing Steven Spielberg, and a pure video that is more traditionally just setting up the camera, videoing the wedding, so children, grandchildren, whomever can watch it. And I wonder about that sort of hybrid nature of this, and help me walk through it, because it's still attached to what really is conduct that is defining of sexual orientation, the ability to marry the same-sex partner. So help me understand why it isn't, at least it's some combination, it seems like it's not clearly Steven Spielberg, but maybe you're right, it's not clearly just taking a still shot of what's going on. So help me understand sort of what I'm calling a hybrid nature of what it is the Larsons are wanting to do. Sure, Your Honor, and I don't think it's hybrid. I think the answer is they exercise comprehensive editorial control over the videos and films that they create. Well, I guess if I can interrupt and sort of push my hybrid theory a little bit further, because it's still putting themselves out there for a public service connected to something that the Supreme Court has said is a right for all persons. And so once you connect your expressive views to that other person's right, that's where I'm trying to kind of maneuver around, and help me understand where we should land, given that some little bit of ambiguity. Well, I think the Supreme Court's balancing of these kinds of laws with free speech and Hurley is the answer. The Supreme Court has never compelled speech where the speaker objects to the message. And understand, here, the state's position is they have the power to coerce artistic expression. And no court has ever ruled that the state has that power. And so I think another thing that's really important is that in Obergefell, the court said that people who hold religious views, like Carl and Angel Larson, do so based on decent and honorable beliefs, and that sincere and reasonable people hold those beliefs. And there's millions of people that hold those beliefs, and not just Christians, but Muslims and Jews and people of other faiths. And so to respect those beliefs and to show the kind of tolerance that those beliefs need within our society, which was the message of Masterpiece and even of Obergefell, the state can't cross that line and force people to endorse an idea about marriage through their speech that violates their beliefs. And I think that's the balance here. The balance is that the free speech clause protects the speaker when they're objecting on the basis of the message. And it does so, and it violates the compelled speech doctrine in at least three ways. Well, before you get there, the briefs did exhaustively talk about compelled speech, but one of the things that I'm left wondering about is strict scrutiny. If you're right and we get to strict scrutiny, I mean, the state didn't want to admit that we get to strict scrutiny, and I'm going to have a conversation with them about it. But if we get to strict scrutiny, do you agree that eliminating discrimination of all types, including sexual orientation discrimination, is a compelling state interest? Yes, the Supreme Court has said that it is, but in Hurley, I think, answers this question. In Hurley, the Supreme Court recognized that the state had the power to command access to goods and services, including on the basis of sexual orientation. But that interest wasn't sufficient when you looked at the particularized test under strict scrutiny of whether the state had a compelling interest to compel speech. That's a different question, and that interest wasn't sufficient in Hurley to compel the speech. Is that a tailoring question, or is it a compelling state interest question? Because that's one of the things I'm struggling with is how to actually figure out the framing of this. Well, it's both, Your Honor. I think that the compelling state interest test is particularized, but there's also a narrow tailoring aspect to this case as well, and the state doesn't satisfy narrow tailoring either. They could easily adopt the message person distinction and allow the law to be interpreted in a way that respects First Amendment rights. I know you want to reserve some time, but I want to ask you one additional question. Which of your claims, the other claims, we didn't get a lot of time to talk about those, and the briefs didn't talk about them, association, et cetera, which ones are derivative of your First Amendment claim? Which ones actually sort of rely on the First Amendment claim you're making? Because it seems to me there's a lot of overlap between the equal protection claim and the association claim and the First Amendment compelled speech claim. So of those claims, which ones depend on the First Amendment? I think the equal protection claim clearly does, Your Honor. Okay. Good morning, Your Honors. Proceed. Masterpiece Cake Sheffie, Colorado, does give us some guidance in this case. The United States Supreme Court declared it unexceptional that state law can protect gay persons just as it can protect other classes of individuals, not only in acquiring whatever products and services they choose, but also in the same terms and conditions as are offered to other members of the public. The court did recognize one well-worn exception, and that's for churches and clergy who do not need to perform same-sex weddings, something that Minnesota already recognizes. But the court also held that if that exception were not confined, then a long list of persons who provide goods and services for marriages and weddings might refuse to do so for gay persons. And it held that that result would be community-wide stigma inconsistent with the history and dynamics of civil rights law. What about one thing, at least help me if there is something in Masterpiece that helps us understand what I'll call the difference between a generic cake and a decorated cake and then moving into what we're calling videography and expressive conduct perhaps. Do you see any unified message from the Supreme Court on how we look at this video process? Well, I do. I think it's noteworthy first to say that the petitioners, according to the Supreme Court in Masterpiece, acknowledged that they would have a much harder fight if they were denying cakes to all same-sex weddings, something that appellants in this case are asking this court to allow them to do. They're coming in here and saying, we want to categorically deny this service to this group of people. The cake baker in Masterpiece was not even taking that extreme of a position. But I do, I acknowledge that a video service is inherently a more custom service. I just don't think that, I think what the reason the court was grappling with that in Masterpiece was because they were trying to get to this issue of protected status versus message. And I want to be very clear that Minnesota's law regulates discrimination based on protected status. It does not regulate message. And I'm happy to talk through how that works out in application here. Well, to follow up on Judge Kelly's question, there seems to be another thing looming in Justice Kennedy's opinion. Of course, Justice Thomas's concurrence covers this explicitly, but there was some uncertainty in the record about whether they were saying that they wouldn't do custom wedding cakes or they wouldn't do any wedding cakes whatsoever. And that seemed to be dispositive for why they didn't address the question. That's what Justice Kennedy suggests. And the clear implication from that is if they're doing custom wedding cakes, that might raise a First Amendment question that prohibiting even off-the-shelf wedding cakes would not. If that's true, then isn't this case basically squarely present that question, which is these are custom videos, and it's like a custom wedding cake. And if the court viewed that differently in Masterpiece and didn't decide it because they didn't know that they had that question, don't we have that question squarely here, and isn't that different? Doesn't that necessarily raise a First Amendment question? So I want to start by just citing to the court the language that I was just referring to, where it says petitioners concede that if a baker refused to sell any goods or any cakes for gay weddings, that would be a different matter, and the state would have a strong case under this court's precedent. So that's Justice Kennedy's language in Masterpiece. To address the issue, the question of whether or not it's custom really gets to the question of whether or not it's compelled speech. Because if the state has a regulation that's directly compelling speech in a message-based way, you're under the compelled speech doctrine. And I think custom cakes could pose that question, where really it becomes about the writing in a particular message versus are they categorically refusing to sell to this protected status altogether. But when we go to the compelled speech doctrine, and I think it's important that we stay within those legal doctrines here, the compelled speech doctrine is really concerned with content-based compelled speech. The first thing you look at in judging compelled speech is what does the government regulation do. And I would refer to cases like Turner Broadcasting, which involves a very expressive medium, television, videos, the very same medium appellants are concerned with here. The court said, although we are compelling you to carry certain types of television programs, it is not compelled speech, despite the expressive medium, because they looked at the regulation, and the regulation was not regulating a message. It was not like Woolley or Barnett, where they were saying you must go out and speak this. It was a content-neutral regulation. So you clearly disagree that this is like the custom wedding cake in Masterpiece. You're saying that that's not what it's like. Is that correct? I don't know that you directly answered my question, which is why I'm following up. No, I'm not trying to evade your question. I think there is a custom aspect to videos, and I acknowledge that. But I think when the court was trying to distinguish between custom and non-custom cakes in Masterpiece, they were trying to get at whether or not Colorado was applying the law in a way that regulated message. And that would have made it more in the camp of Hurley, where they were actually regulating the speech itself, not just the sale of the services. Minnesota adamantly enforces its law in a way that regulates the sale of the services only, conduct, purely conduct, unrelated to any kind of message. The fact that appellants may want to make videos, or wedding videos, is, from Minnesota's perspective, not the significant piece of this question. So you disagree with Judge Thunheim, then, because Judge, at least the basic theory, because he said there is speech involved. He says it's speech bound up in conduct. But there is speech involved, which is why he applied a form of intermediate scrutiny. So the state disagrees with that. Well, the state's position that this is a content-neutral regulation. There may be incidental effects on speech in certain circumstances. And as it applies to appellants, I think that may be the case, that there could be incidental effects on speech. But that's where it falls under intermediate scrutiny, Your Honor, not the compelled speech doctrine. Okay, so that's a little different than what I thought you were saying. On the content-neutral point, how is this content-neutral? And the reason why I ask it is, it's one thing to say it has an incidental effect on speech, which I understand Judge Thunheim to have also said. It's another thing to say it's content-neutral. In my view, to the extent it touches speech, it prohibits only discriminatory speech. And that's not content-neutral. Am I wrong about that? It doesn't touch other forms of speech. Well, so the only, I think, speech it touches is the kind of speech that Rumsfeld recognized is really conduct, right? The white applicants-only type speech. As it relates to the sale of services, the regulation itself is neutral as to what message or what service is contained in the denial, right? So appellants could be denying a same-sex wedding. They could be denying a birthday video. It's not the discriminatory nature of it that is of the speech that it's regulating. It's the sale of the service. So if they did a video that said discrimination is really, really bad, the Larsons did that, really bad, would they be prosecuted under the statute? They're not being prosecuted. They would never be prosecuted for the content of their video. It would be about who they sold it to. Who they sold it to, okay. I'm still concerned about the content neutrality point, which is you admit that there's speech here. You admit that Judge Thunheim says there's an incidental effect on speech, and yet you say it's content neutral. I guess I just still don't understand your argument as to why it's content neutral. Because it is only banning conduct. The sale of services is good. That's it. So if we disagree with you that it's only about conduct, then the state probably loses, unless we find that there's a compelling state interest and it's narrowly tailored. And I do want to get to that as well. But I guess I would defer... I don't believe at this point the court even... I would defer the court to Roberts v. USJC's, a case in which the United States Supreme Court explicitly looked at Minnesota's Human Rights Act. And there the court said that this law does not aim at the suppression of speech. So that's already been determined by the United States Supreme Court. This is a content neutral law. They said it does not distinguish between prohibited and permitted activity on the basis of viewpoint. And that it does not license enforcement authorities to administer the statute on the basis of such constitutionally impermissible criteria. So the United States Supreme Court has already found this to be a content neutral statute. And it's being applied in a very traditional way. Appellants come here today and what they do not tell you is they do not say any law in which a state anti-discrimination law like this  to a traditional commodity retail business. They do not say a single case across the country or at the United States Supreme Court where the First Amendment has trumped this kind of standard application of public accommodation law. But they cite... Excuse me. Counsel, if... Let me give a hypothetical. If the appellants agreed to produce one of these video productions for a same-sex couple, but the production that they produced delivered the message that same-sex marriage is bad. And that traditional marriage is good. Would that be... Would they be in violation of the act? I do not believe they'd be providing the same services that they are providing to others. They'd be providing different services. While the opposite sex couple could get a positive video, the same-sex couple would get a critical video. If for the same reason, you know, a videographer couldn't do positive videos only of same-sex wedding and do hostile videos of opposite-sex weddings. It's not the viewpoint that matters. It's the sale of the services. And they need to be entitled to receive the same... And this is from Masterpiece again. They need to be entitled to the same products and services on the same terms and conditions as other members of the public. That's what these laws stand for. What about the ghostwriter example? Do you agree with the district court that... I mean, would Minnesota require someone who puts out their business as writing, as being a ghostwriter, refusing to write on a certain topic, for example, same-sex marriage? So if a person hangs up their shingle and says, all who come in, we will write for you, they could not turn someone away based on their protected status. No message can be different. So it would depend. If they say, we will write about that particular subject matter for whoever comes in, then yes, they cannot turn away based on protected status. They can't say, I won't write books for people who are African-American. They just can't say that if they're offering a public accommodation. That's all the law says. It's really a very simple law in that way. So regardless of who requests the same-sex video, it is still connected so intimately to the same-sex couple that that's where the discrimination lies? So in this instance, I would refer the court to Bob Jones University, Lawrence v. Texas, and Christian Legal Society. These are cases in which the Supreme Court has said there can sometimes... Parties have come before the court and tried to say, we're not really discriminating on the basis of status. We're just discriminating on the basis of conduct or message. Bob Jones University involved an opposition by the university to interracial marriage. And they said, it's not discriminatory. We let all races here. We just don't let them interact. The court said, no. That's still... That's so tied up with their status, that's still discriminatory. Court reached the same thing as it related to same-sex relationships and same-sex weddings in Lawrence and Christian Legal Society. So I think both this court and my clients, frankly, are bound by those precedents. And so bound to recognize that as it relates to weddings, a same-sex wedding is so tied into the status of the individuals that that has to be treated as similar to status-based discrimination. I'm just going to throw out a wild hypothetical here because it kind of leverages a little bit what Judge Kelly said. What a non-Jewish... So what a rabbi, if a Muslim couple came in and wanted a wedding, would a rabbi have to perform that wedding? So that falls into the really well-recognized exception with Masterpiece Recognized. And Minnesota's law wouldn't apply in that circumstance, quite frankly, because it exempts religious organizations and non-profits connected to religion from its laws. And that's a well-worn exception, I think, within these areas that the court does not regulate church activities and church beliefs. So that falls into an exception that doesn't apply here. All right, so then I'm going to change it slightly to get us out of that exception. And I was going to say, assume the exception doesn't apply, but I'm not going to do that, which is suppose that a Muslim tattoo artist, a Christian person comes in the door and says, I want you to tattoo on my arm, my God is the only God, which obviously would be completely against the Muslim's viewpoints. Any discrimination there if the tattoo artist says no? I think if it's... The hard part about the hypotheticals is the facts, circumstantial facts matter a lot. Is this particular tattoo artist refusing to do any kind of Christian messaging? Are they refusing categorically to do Christians? Or is it this particular message that they would not do for anybody? And I think that's the fundamental question. They don't want to do this message. Just like, I mean, it's very similar to the claim here, which is we just don't want to do same-sex weddings because we don't like the message. Except for here they're saying, we will categorically not do anything connected to your sexual status at all, right? They're not saying they'll do anniversaries or their funerals. They object to their status as a married couple, which is the very defining thing of a same-sex individual, of a gay person, is their relationship with same-sex people. If the tattoo artist was similarly categorically denied to serve Christians, absolutely this law would apply. If, on the other hand, it's a particular message and it's not the surrounding circumstances make it look like it's not really based on religion, but it's based on this particular message, then there isn't the evidence that the protected status is the animus behind the denial of service. And that's what my client looks at. I do also want to give one more site to your question earlier about the impacts of a content-neutral law. And this, again, comes from Turner Broadcasting. A content-neutral law such as this law is given less scrutiny because it poses less substantial risk of exercising certain ideas or viewpoints from the public dialogue. And this gets back to the compelled speech idea. The reason compelled speech is so particularly concerned with whether a message has been delivered, whether a message is being compelled by the law, or whether it's a content-neutral application, is because the purpose of the doctrine is to prevent government-mandated messages, government taking a side in a particular debate. Here, Minnesota's regulating a commercial enterprise.  we are committed to non-segregated public accommodations in Minnesota, and we are not going to allow, regardless of the reason motivating the discrimination, we aren't going to allow people to be treated differently in public accommodations. And so there is not a viewpoint or certain idea that Minnesota is prohibiting the appellants from speaking. They are fully free to speak their messages, to create films. It's just that if they choose to sell public accommodations and certain products to the world writ large, they cannot say, except you, we will not serve you, if that is a protected status. That is all Minnesota's law does. It's why it's a content-neutral law, and it's why we think intermediate scrutiny applies. Let me just follow up really quickly on that exact point you made, which is there's two ways to see the framing of this case. You can see it as each individual video, and whether each individual video is compelled speech, so that if a same-sex couple comes in, are you compelling them to speak? You can also view it, and I think the way they want us to view it, opposing counsel, is that they have an overriding message, that they'd love to put a message on their website, I think, that says, we believe in the sanctity of God. We believe in opposite-sex marriage. We want to celebrate that, et cetera. If they were forced to do a same-sex wedding, it would interfere with that long-term message, that message that they want to convey. What's the state's response to that? They are absolutely free to put that message on their website, as long as it doesn't say, we won't serve you, because that falls into that Rumsfeld white applicants only situation. I guess I would just remind the court that sometimes these anti-discrimination laws, this is not the first time that there have been strongly held beliefs by people who are considered decent and upstanding members of the society, who wanted to act in a way that caused discrimination within public accommodations. That's not a problem. If they can put that particular message on their website, and then the state forces them to perform same-sex weddings, that doesn't present a compelled speech problem, you think? So they're forced to do something that's contrary to the very idea that they're expressing. They are forced to provide the products they choose to sell to the public, to all people, regardless of protected status. If in this situation, that incidentally means  I think that's the outcome here. But I would urge the court to remember that there were strongly held beliefs about integrated lunch counters. There were strongly held beliefs about segregated schools. I mean, National Guard had to go in to integrate these places. These were very strongly held beliefs by individuals at that time. And yet the Supreme Court in heart of Atlanta repeatedly said that is not an exception. In fact, in Newman v. Piggy Park, the Supreme Court said that religious objections to serving people based on race, even very strongly held ones, were not meritorious and called them frivolous. So I would also urge the court to take mind of the fact that there aren't real limitations on the exception they're asking you to embrace today. They don't tell you how they're going to limit this doctrine. They don't tell you how they're going to limit to just same-sex couples. They don't tell you how they're going to limit it to weddings. They're asking for a broad exception to anti-discrimination laws that would absolutely open the door to discrimination on the basis of race, discrimination on the basis of religion. As long as the person had a strongly held belief, and as long as they felt that there was some expressive message to their business, they would not have to comply. And that is a very, very broad exception, and one that no court has ever recognized. Minnesota's law is supported by very compelling reasons. This country understands that segregated systems of public commerce are not good. They do not benefit the public writ large, and they also severely harm dignity interests of individuals. And so Minnesota's law is compelling. The Roberts Court recognized that. I would refer the court to the task force findings that underpin the inclusion of same-sex couples and sexual orientation in its law. It is detailed and specific as to the harms that these individuals were suffering. And the law is narrowly tailored. It only prescribes the conduct it seeks to prohibit, the sale of goods in a discriminatory manner. That's it. That is the alpha and the omega of the law. Just quickly, is there anything about the amendment to the Minnesota Act since the Jaycees case? You've described the extensive fact-finding based on discrimination that Minnesota found based on sexual orientation. Is there anything else that's changed about the Act or any analysis, in your view, from the Jaycees case that would give us pause to give it the same stamp of approval that the Supreme Court did in Jaycees? Sexual orientation was added based on those task force findings, which are very detailed. I know appellants put a lot of weight on this idea of legitimate business purpose, which wasn't analyzed in Jaycees. That, of course, comes out of the McDonnell-Douglas test, something that courts are very familiar with and which I don't think suggests any kind of First Amendment implications that are problematic, because it's a standard that's understood to really be trying to drive the question of whether or not protected status was the discriminatory animus or the animus of the decision or whether it was something else. Otherwise, no. I think when you read through Jaycees, the analysis there really applies just kind of whole cloth here. The Act is fundamentally the same Act as it was then. We would urge the court to affirm. If there's no other questions. Can I ask one additional question? Sure. On the strict scrutiny analysis, we only get there if we think it's compelled speech, so we would have to disagree with you on the compelled speech point, which is one of the things I'm struggling with, is how to do strict scrutiny here. Would the state lose at that point? Let me follow up, which is to say that I find it hard to believe that the state would have a compelling state interest in, say, prohibiting somebody on a street corner from saying something racist, because that's pure speech. And so if we find that it's compelled speech, doesn't the state necessarily lose because they have no interest in compelling somebody to speak? I struggle with that because that is such a different circumstance. This law does not try to do what that is. This law does not try to prohibit somebody on a street corner. And it's really not trying to prohibit their message. They're entitled to their message. It's trying to regulate the sale of goods. I agree that I struggle to think of a... You know, there are situations where states can regulate things like fighting words and hate speech. And Roberts v. Jaycees, at least, has some language that suggests discriminatory acts, discrimination in the provision of services may fall into a similar exemption to that. So I think that does suggest that even in the compelled speech, even in a very extreme version like that, there may be an exception. But I do want to be clear that that is not what Minnesota is trying to do here. It is really the sales of goods and services that concern us. All right. Thank you, Your Honor. Thank you. How much time does Mr. Tedesco have left? You've got about 3 1⁄2 minutes, Counsel. Thank you, Your Honor. I want to just address a few things. First, the same speech test is unworkable. And the Muslim hypothetical shows why. The Muslim tattoo artist would tattoo the message My God is the only God on a Muslim client. And the state's position is that because he would do that, he has to tattoo it on a Christian client as well. That changes the message. Context matters. If someone created a cake with a cross on it for the First Communion, that cake would create a very different message, send a very different message, if they created that cake for the KKK. And so context matters. That's why the same speech test does not work. This law does not regulate conduct as applied to the Larsons. It regulates speech and pure speech, the creation of films. And I think that's a really important distinction. This is not a law that regulates conduct. It's true that public accommodations laws, generally speaking, regulate conduct and are well within the power of the states to adopt and that the Supreme Court even recognized in Hurley that these laws are content-neutral on their face and don't jeopardize expression. But that's not the question in this case. The question is when they apply it peculiarly to speech itself, which is what's occurring here, compelling people to express messages through their films that violate their beliefs, Hurley says that interest doesn't satisfy the analysis. And that's why they do have a problem under strict scrutiny, Your Honor. Under strict scrutiny, the state has to prove here that they have a compelling interest sufficient to compel artistic expression that violates the artist's beliefs to commandeer the editorial control and judgment of a filmmaker and tell them they have to select projects they don't want to take on and conduct interviews they don't want to conduct, edit films in a way that express messages that they are diametrically opposed to. That clearly crosses the line. Your Honor... Just for clarification in reading the complaint, since we're at that stage of the proceeding, do I understand the complaint to allege that the appellants are already engaged in this activity? Or does it allege that they provide videography services now and they want to or they plan to refine or change the scope of their services in order to create these message-laden videos? They desire to immediately enter the industry. They're not currently in it. And the state's law puts them to a choice. Face steep fines and jail time or silence your speech. And neither of those choices are acceptable, which is why they filed the lawsuit. And they have that ability under this Court's relaxed requirements, understanding when you're challenging, on First Amendment grounds, a law that imposes criminal penalties. And, Your Honor, I just want to end with Masterpiece. Masterpiece talks about how tolerance and respect is needed in this context and how people who believe the things that Carl Angel Larson do about marriage need to have the space in public life and in the public square to live out those beliefs and recognize, I think most importantly, that sometimes these laws will cross the line and force people to engage in expression they disagree with in relationship to marriage. That is this case. It's squarely presented by the facts of this case. And the compelled speech doctrine requires a result in favor of the Larsons. Thank you. Thank you very much, Counsel. All right, the case is submitted. Thank, Counsel, for your arguments. And you may stand aside at this point.